993 F.2d 1087
 21 Media L. Rep. 1449
 Roger CHAPIN; Help Hospitalized Veterans, Incorporated,
Plaintiffs-Appellants,
v.
KNIGHT-RIDDER, INCORPORATED; Philadelphia Newspapers,
Incorporated; The Philadelphia Inquirer; Frank
Greve, Defendants-Appellees.
 No. 92-1165.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 17, 1992.
Decided May 19, 1993.
 
 Norman Roy Grutman, Grutman, Greene & Humphrey, New York City, argued (Jewel Humphrey, Grutman, Greene & Humphrey, New York City, Frank M. Northam, Alan Dye, Webster, Chamberlain & Bean, Washington, D.C., Henry Paul Monaghan, New York City, on the brief), for plaintiffs-appellants.
 Kevin Taylor Baine, Williams & Connolly, Washington, D.C., argued (Nicole K. Seligman, Bonnie Robin-Vergeer, Dane H. Butswinkas, Williams & Connolly, Washington, D.C., on the brief), for defendants-appellees.
 Before RUSSELL, WIDENER, and HALL, Circuit Judges.
 OPINION
 K.K. HALL, Circuit Judge:
 
 
 1
 Plaintiffs Roger Chapin and Help Hospitalized Veterans, Inc., appeal the district court's order granting defendants' motion to dismiss this libel action. We must decide whether a newspaper article published by defendants can be reasonably read to express the libelous meanings ascribed to it by the plaintiffs. Concluding that it cannot, we affirm.
 
 I.
 
 2
 Plaintiff Roger Chapin's trade is operating charities. He is the president of Citizens for a Drug-Free America ("CDFA"), Project Drug-Free, and co-plaintiff Help Hospitalized Veterans, Inc. ("HHV"). All of these entities are non-profit organizations, and Chapin and his wife are paid employees of each.
 
 
 3
 In the fall of 1990, while Iraqi and United Nations troops glowered at one another in the Persian Gulf, Chapin's HHV charity sponsored a program to send "Gift Pacs" to American soldiers in Saudi Arabia. A contributor could send a Gift Pac to the troops for $15, or $25 for two. For another $6, the purchaser could have the Gift Pac delivered to a particular soldier. The items in the Gift Pac were snack-size packages of various junk foods.[1] Promotional materials assured potential purchasers that the retail value of the items was $14.40.
 
 
 4
 The program flourished; the public purchased 853,699 Gift Pacs. However, at the height of the drive, on December 2, 1990, the Philadelphia Inquirer published a story written by Frank Greve. This story pointedly questioned the finances of the program and the apparent "hefty mark-up" between the wholesale cost of the items in the Gift Pac and the price charged the public. The article wondered aloud "where the rest of the money goes." The article was picked up by other newspapers in the Knight-Ridder chain and so received national exposure.
 
 
 5
 According to plaintiffs, this article caused sales of Gift Pacs to precipitously decline, and HHV suffered a $1.6 million loss on the project. On August 22, 1991, Chapin and HHV filed this libel suit in district court against Knight-Ridder, the Philadelphia Inquirer,[2] Philadelphia Newspapers, Inc., and Frank Greve. Plaintiffs sought $150 million in damages.
 
 
 6
 Following discovery, defendants moved to dismiss under Fed.R.Civ.Pr. 12(b)(6) because the statements complained of by the plaintiffs were not actionable as a matter of law. On January 22, 1992, the district court granted the motion to dismiss, with its reasons to be elaborated in a later memorandum opinion. The district court's detailed memorandum was filed on March 17, 1992. Chapin v. Greve, 787 F.Supp. 557 (E.D.Va.1992). The court found that all of the statements plaintiffs identified were either admitted by plaintiffs to be true or were subjective value judgments that could not be true or false. The court also held that the article could not reasonably be read to express several defamatory implications alleged by plaintiffs.
 
 
 7
 Plaintiffs appeal.
 
 II.
 
 8
 Although Virginia's common law of libel governs this diversity case,[3] the First Amendment's press and speech clauses greatly restrict the common law where the defendant is a member of the press, the plaintiff is a public figure, or the subject matter of the supposed libel touches on a matter of public concern. See New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Where, as here, all of these considerations are present,[4] the constitutional protection of the press reaches its apogee.
 
 
 9
 In Virginia, the elements of libel are (1) publication of (2) an actionable statement with (3) the requisite intent.[5] See generally, Gazette, Inc. v. Harris, 229 Va. 1, 325 S.E.2d 713, cert. denied, 472 U.S. 1032, 105 S.Ct. 3513, 87 L.Ed.2d 643 (1985). To be "actionable," the statement must be not only false, but also defamatory, that is, it must "tend[ ] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement (Second) of Torts § 559. As one court put it, defamatory words are those that "make the plaintiff appear odious, infamous, or ridiculous." McBride v. Merrell Dow and Pharmaceuticals, Inc., 540 F.Supp. 1252, 1254 (D.D.C.1982), rev'd in part on other grounds, 717 F.2d 1460 (D.C.Cir.1983). Merely offensive or unpleasant statements are not defamatory. Whether a statement is actionable is a matter of law to be determined by the court. Chaves v. Johnson, 230 Va. 112, 335 S.E.2d 97 (1985).
 
 
 10
 The falsity of a statement and the defamatory "sting" of the publication must coincide--that is, where the alleged defamatory "sting" arises from substantially true facts, the plaintiff may not rely on minor or irrelevant inaccuracies to state a claim for libel. AIDS Counseling & Testing Centers v. Group W Television, Inc., 903 F.2d 1000, 1004 (4th Cir.1990).
 
 
 11
 On a motion to dismiss a libel suit because of no actionable statement, the court must of course credit the plaintiff's allegation of the factual falsity of a statement. Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In this case, however, the complaint couches its allegations of falsity in vague, conclusory terms, and the district court required briefs and heard argument on several occasions in order to clarify which particular factual assertions or connotations the plaintiffs allege are false.
 
 
 12
 The district court discovered that the plaintiffs primarily allege the falsity of implications, rather than the facts literally related by the Greve article. A defamatory implication must be present in the plain and natural meaning of the words used. Carwile v. Richmond Newspapers, Inc., 196 Va. 1, 82 S.E.2d 588, 591-592 (1954). Moreover, because the constitution provides a sanctuary for truth,[6] a libel-by-implication plaintiff must make an especially rigorous showing where the expressed facts are literally true. The language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference. White v. Fraternal Order of Police, 909 F.2d 512, 520 (D.C.Cir.1990).
 
 III.
 
 13
 As did the district court, we reproduce the Philadelphia Inquirer article and Knight-Ridder wire release as appendices to our opinion. However, because repeated references to these appendices would be unwieldy, we quote below in boldface the particular statements in the article from which plaintiffs would infer the libel, with our analysis of each statement directly following its quotation. We then consider the article as a whole.
 
 
 14
 1. "HEFTY MARK-UPS"
 
 
 15
 While many American businesses are donating products to GIs stationed in Saudi Arabia for the holidays, a widely promoted charity is charging hefty mark-ups on goods it ships to them.
 
 
 16
 Plaintiffs complain that the words "hefty mark-ups" imply that they were making a large profit and were pocketing it. "Hefty" is the author's opinion of the mark-up based on his estimate that the wholesale cost of the items in the Gift Pac was under $8. Though opinion per se is not immune from a suit for libel, a statement is not actionable unless it asserts a provably false fact or factual connotation. Milkovich v. Lorain Journal Co., 497 U.S. 1, 19, 110 S.Ct. 2695, 2706, 111 L.Ed.2d 1 (1990); Potomac Valve & Fitting, Inc. v. Crawford Fitting Co., 829 F.2d 1280, 1288 (4th Cir.1987) (presaging Milkovich by placing primary emphasis of erstwhile fact-versus-opinion inquiry on verifiability of the statement). "Hefty" is just too subjective a word to be proved false. The use of the term "mark-up" instead of "profit" or the like makes the pocket-lining inference plaintiffs would draw implausible.[7] In addition, the rest of the article, in some detail, recounts Greve's efforts to estimate the wholesale cost of the items in the Gift Pac. Because the bases for the "hefty mark-up" conclusion are fully disclosed, no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related. Potomac Valve, 829 F.2d at 1289-1290 (even statement capable of being proved false would be understood as author's opinion where it was a conclusory punch line following fully-disclosed facts); accord, Phantom Touring, Inc. v. Affiliated Publications, 953 F.2d 724, 729-730 (1st Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 2942, 119 L.Ed.2d 567 (1992).
 
 
 17
 Finally, though "there is no such thing as a [true] idea,"[8] Greve's opinion was certainly defensible. Indeed, when he wrote the article, Greve did not know that the mark-up was even more "hefty" than his estimate. The costs associated with each Gift-Pac, as disclosed in discovery by the plaintiffs, were:
 
 
 18
 Thus, the mark-up from the wholesale cost of the items and package was over 100%--"hefty" to most minds, we would think. The heavy advertising and solicitation expenses--$7.93 per Pac--are a feature of Chapin-run charities, as we will have cause to mention below.
 
 
 19
 2. "WHO WILL BENEFIT MORE?"
 
 
 20
 But one question is hard to answer: Who will benefit more from the project--GIs or veteran charity entrepreneur Roger Chapin of San Diego and Falls Church, Va., the organizer of the campaign?
 
 
 21
 This question is pointed, and could certainly arouse a reader's suspicion. A question can conceivably be defamatory, though it must be reasonably read as an assertion of a false fact; inquiry itself, however embarrassing or unpleasant to its subject, is not accusation. The language used cannot be tortured to "make that certain which is in fact uncertain." Carwile, 82 S.E.2d at 592.
 
 
 22
 This question cannot be reasonably read to imply the assertion of the false and defamatory fact--pocket-lining--of which plaintiffs complain. The question simply provokes public scrutiny of the plaintiffs' activities. Voluntary public figures must tolerate such examination.
 
 
 23
 "Benefit" to Chapin does not naturally imply direct pocketing of Gift Pac sales proceeds or even dishonesty in a more general sense. As the complaint alleges, Chapin has a public reputation as an organizer of charities, and a successful Gift Pac program could "benefit" him insofar as the public might hold him in higher esteem. Moreover, Chapin and his wife are salaried employees of HHV, CDFA, and Project Drug-Free, and their combined income from these positions has increased steadily and substantially.[9] The revenue intake of the charities is essential to these salaries, and responsible award of raises is possible only with increasing revenues. In short, even if the question posed by Greve were construed as an assertion that Chapin benefitted financially from the Gift Pac program, the assertion would be substantially true.
 
 
 24
 Chapin also complains of his description as a "veteran charity entrepreneur." The meaning any reader would draw is that Chapin has, for some time, organized and operated charities, all of which is true. On the other hand, the use of the word "entrepreneur" may be taken by the astute reader as a sarcastic hint that the reporter does not have a high regard for persons who operate "non-profit" charities at comfortable salaries. Nonetheless, this opinion is incapable of being proved false, and the reader is certainly free to adhere to a contrary view.
 
 
 25
 3. "NEGATIVE BANK BALANCE"
 
 
 26
 Chapin's previous venture was an anti-drug crusade that raised $7.1 million in 1989, spent $6.8 million of it on direct mail, and ended the year with a negative bank balance of $39,486, according to Internal Revenue Service records. He declined to be interviewed about the Gift Pac.
 
 
 27
 . . . . .
 
 
 28
 * * *
 
 
 29
 Chapin declined to answer written questions about all these issues, saying earlier reporting about his anti-drug war effort, Citizens for a Drug Free America, had been unfair.
 
 
 30
 Everything in these statements is true. Plaintiffs complain that Greve should have noted that CDFA had other assets that could have covered the negative bank balance. The article does not say that CDFA was insolvent; rather, it accurately reports that CDFA overdrew its bank account by nearly $40,000. Moreover, CDFA was, in fact, in the red. The other assets plaintiffs identify were more than offset by accounts payable and accrued expenses. On the very document (CDFA's IRS Form 990 for tax year 1989) plaintiffs submitted to show the "falsity" of the "negative bank balance" assertion, CDFA's net assets are reported as negative $55,205. Accordingly, even the implication about which plaintiffs grumble is true.
 
 
 31
 Chapin also alleges that reporting of CDFA's expenditures and strained finances implies that he is dishonest or incompetent. As for dishonesty, we do not think that poor financial condition necessarily implies any such thing. Insolvency is often, maybe most often, simply the result of bad luck, and our society closed its debtors' prisons long ago. CDFA's extreme direct mail expense ($6.8 million out of $7.1 million raised) certainly might make an observer skeptical of Chapin's management acumen. Even if a reader would conclude that Chapin is incompetent or that he does not operate efficient charities, the reader's opinion (which is itself incapable of being false) would not make the true facts on which the opinion was based a libel. Nat'l Foundation for Cancer Research, Inc. v. Council of Better Business Bureaus, Inc., 705 F.2d 98, 100-101 (4th Cir.) (defendant's statement that charity did not spend "reasonable percentage" of income on program services was constitutionally-protected opinion), cert. denied, 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983). The truth may sting, but it is the truth nonetheless, and persons who inject themselves into public activities like charity fundraising must accept the public eye.
 
 
 32
 Next, plaintiffs complain that the article implies "fraudulent concealment" by mentioning that Chapin declined to be interviewed for the article. The district court aptly remarked that people in the public eye routinely decline interviews. 787 F.Supp. at 566. "No comment" has become such a hackneyed response to media inquiries that it has been reduced to insignificance. Moreover, the article reported Chapin's excuse for not granting the interview--his displeasure at the fairness of earlier media attention. This excuse is certainly a plausible one, and a fair-minded reader would credit it, or at least would not leap headlong to the extreme conclusion that the Gift Pac is a fraud.
 
 
 33
 4. "PEOPLE RAISED QUESTIONS"
 
 
 34
 Other people however, raised questions about the "G.I. Gift Pac" effort, which is being carried out under the auspices of another charity organized by Chapin, [HHV].
 
 Among the problems:
 
 35
 --Telephone order takers don't tell contributors this, but the last shipment likely to reach the Persian Gulf before Christmas sailed Nov. 27, according to Steve Gould, president of Precise Kit promotions, which assembles Chapin's gift packs.
 
 
 36
 --Three eminent retired generals, William C. Westmoreland, Victor Krulak and George Patton 3d, are named as "friends" on letterheads used in "Gift Pac" promotional material. But all three, in telephone interviews, said they had no knowledge of the effort and recalled no association with Chapin.
 
 
 37
 Everything in these paragraphs is true. In fact, during discovery, the plaintiffs admitted that the last shipment that conceivably could reach the Gulf before Christmas sailed on November 17, ten days earlier than the date Greve reported. Though the three generals had lent their names years earlier as "friends" of HHV undertakings, plaintiffs do not dispute that the generals told Greve that they did not remember Chapin or know anything about the Gift Pac program.
 
 
 38
 5. "WHOLESALE VALUE IS ABOUT $8"
 
 
 39
 Although some retailers in monopoly markets might charge up to $15 for the snacks in the gift pack, their wholesale value is about $8, according to grocery buyers. Chapin, in a promotional press conference Oct. 30, said he had bought at prices "below wholesale."
 
 
 40
 All true, once again. As we mentioned above, plaintiffs' actual cost for the items was $5.50, well below Greve's $8 estimate. Plaintiffs again complain that the reporting of these true facts is intended to convey the false impression that they lined their pockets. We disagree. The article simply invites inquiry about the mark-up.
 
 
 41
 6. "IT IS NOT CLEAR WHERE THE REST OF THE MONEY GOES"
 
 
 42
 With the Defense Department picking up the costs of shipping the gift packs from Port Elizabeth, N.J. to the Persian Gulf, and "many major television and radio stations" contributing advertising time, according to Chapin, it is not clear where the rest of the money goes. Gould says he charges $1 for packaging, and the trucking bill to Port Elizabeth adds 18 cents.
 
 
 43
 Plaintiffs complain about the sentence "it is not clear where the rest of the money goes." We do not know how this statement could be false. Greve did not know; Chapin would not tell him; Greve invited the public to ask. This invitation, rather than a libel, is the paradigm of a properly functioning press. Again, plaintiffs argue that the question implies the answer: Chapin is a dishonest man who pockets the difference. That answer was certainly within the wide range of possibilities, which is precisely why we need and must permit a free press to ask the question.
 
 
 44
 7. "BOTTOM LINE"
 
 
 45
 Bottom line: Chapin's costs for the $15 gift packs appear to be under $10. In a snack food industry where normal mark-ups are about 35 percent, Chapin's charity seems to be posting better than 50 percent.
 
 
 46
 Plaintiffs allege that this paragraph implies that the Gift Pac program had a large financial surplus. It does not; it speaks of the mark-up between the wholesale and retail prices of snack foods. Inasmuch as the actual Gift Pac mark-up was over 100%, it is ironic that plaintiffs complain of the implications of this conservative estimate. Moreover, the paragraph does not speak in certainties; it describes appearances, and contributes to the general question the article asks--where does the money go? The words cannot be perverted to "make that certain which is in fact uncertain." Carwile, 82 S.E.2d at 592.
 
 
 47
 Plaintiffs also complain that the words "bottom line" imply profiteering. We agree with the district court's opinion that, in context, " 'bottom line' ... connotes 'cutting to the chase,' not an accounting conclusion." Chapin, 787 F.Supp. at 566-567.
 
 
 48
 Finally, we endorse the district court's observation that there is nothing defamatory about the use of business terms in critiques of the finances of charities. Id. at 567. Charities, like businesses, seek to minimize expenses; the use of a charity's surplus--program services and salaries instead of dividends and accumulated equity--is hardly sufficient to warrant an independent vocabulary.
 
 
 49
 8. "CONFLICTING STATEMENTS"
 
 
 50
 He has made conflicting statements about the handling of possible surpluses from the "Gift Pac" drive. "Gift Pac" promotional material distributed this fall said surpluses, if any, would go to Chapin's Help Hospitalized Veterans, a provider of craft kits to VA hospitals. In a brief conversation this week, Chapin said surpluses would be used to buy more gift packs or possibly be donated to the USO, a military charity.
 
 
 51
 Plaintiffs object to the use of the word "conflicting" in the first sentence, though that adjective accurately describes the relationship between Chapin's statements. There is no contention that the statements are not accurately recounted. Moreover, any "sting" from the "conflicting" statements is assuaged by the charitable, unobjectionable nature of each of the proposed uses of excess funds.
 
 
 52
 An irony of these complaints is that plaintiffs object to Greve's supposed insinuation (discussed above) that there might be surplus funds, and yet Chapin undeniably offered explanations of how surpluses would be used. This non sequitur epitomizes defendants' characterization of the complaint as a "moving target."
 
 
 53
 9. CONGRESSMAN: "NO ONE SHOULD LINE THEIR POCKETS"
 
 
 54
 "I just hope that the cost reports of $14 or more per kit are, in fact, true," said Rep. Fortney H. "Pete" Stark (D.Calif.), a member of the House Select Committee on Narcotics who was sharply critical of Chapin's earlier anti-drug effort. "No one should line their pockets by playing on the sentiments of the holiday season."
 
 
 55
 This quote comes closer than anything else in the article to insinuating wrongdoing, and hence presents our most difficult inquiry. Though the statement is couched in uncertainty ("I just hope"), it leaves "pocket-lining" as the only alternative to "true" cost reports. On the other hand, it does accurately quote a member of the House of Representatives, whom Chapin did not sue in this action.[10]
 
 
 56
 Even if we assume that Representative Stark leveled a defamatory charge against plaintiffs, it was certainly newsworthy that the charge was made. At common law, each republication of a libel was a separate tort. Restatement (Second) of Torts § 578. Literal adherence to this rule would sap the vigor of public debate, and could frighten the press from even reporting to the public the few debates that might occur. For these reasons, the republication rule has been severely limited by the courts.
 
 
 57
 Most jurisdictions, even at common law, had adopted some variant of the "fair report" privilege, which protected press reports of official actions or proceedings, so long as the report was accurate and either complete or fairly abridged. Restatement (Second) of Torts § 611. This rule was strengthened and given constitutional mettle in Greenbelt Cooperative Publishing Ass'n v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), and Time, Inc. v. Pape, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971). In Greenbelt, a charge of "blackmail" was hurled at the public-figure plaintiff during angry debate at a city council meeting. In Pape, the policeman plaintiff received unflattering mention in a United States Commission on Civil Rights report on police brutality. In both cases, the Supreme Court ruled that accurate press accounts of the allegations were privileged.[11]
 
 
 58
 The Second Circuit has expanded the "fair report" privilege into a more general "neutral reportage" privilege, which protects the "accurate and disinterested reporting" of charges on matters of public concern made by a "responsible, prominent" party against a public figure. Edwards v. National Audubon Society, Inc., 556 F.2d 113 (2nd Cir.), cert. denied, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977). We have never adopted or rejected the "neutral reportage" privilege, and the Supreme Court specifically reserved the issue in a case in which the privilege could have been, but was not, asserted. Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 660-661 n. 1, 109 S.Ct. 2678, 2682 n. 1, 105 L.Ed.2d 562 (1989); see also id., at 694, 109 S.Ct. at 2699 (Blackmun, J., concurring) (petitioner's failure to assert neutral reportage privilege "unwise"). At least one district court in our circuit is among the smattering of courts that has recognized the privilege. Sunshine Sportswear & Electronics, Inc. v. WSOC Television, Inc., 738 F.Supp. 1499 (D.S.C.1989).
 
 
 59
 On the other hand, we have applied the "fair report" privilege to the contents of a reprimand letter issued by a contractor of the National Cancer Institute, a government agency, to one of the contractor's employees. Reuber v. Food Chemical News, Inc., 925 F.2d 703, 712-713 (4th Cir.) (en banc), cert. denied, --- U.S. ----, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991). In one respect, Congressman Stark's remarks differ from the Reuber letter in that the reprimand in that case was an "official" action. On the other hand, the Reuber reprimand was leaked to the press, and was never intended to be made public, while Congressman Stark composed his statement for the very purpose of putting it in print. Furthermore, from the public's viewpoint, a higher proportion of the "unofficial" public statements of congressmen will be newsworthy and of concern than will the countless "official" documents generated by quasi-public agencies.
 
 
 60
 Until we face a case with a "prominent, responsible," but nongovernmental speaker, we need not cast our lot one way or the other on the full Edwards neutral reportage privilege. We think that a fair and accurate report of the public remarks of a member of Congress fits within the "fair report" privilege as we recognized it in Reuber.
 
 
 61
 Finally, the "fair report" privilege is not absolute, and can be lost where, with actual malice, the press plainly adopts the defamatory statement as its own. In this case, however, Greve accurately attributed the quote, mentioned the potential bias of the speaker ("who has been sharply critical of Chapin's earlier anti-drug effort"), and immediately followed the quote with an endorsement of Chapin's character from Gift Pac spokesman Art Linkletter. (See appendix--"I know he's a good guy. I'm betting on his record.") We hold that the "fair report" privilege protects these defendants from any actionable implication that may be contained in Representative Stark's comments.
 
 
 62
 10. DATES TO SAUDI ARABIA--COALS TO NEWCASTLE?
 
 
 63
 The issue of the gift pack's value is summed up by what Chapin says is its most expensive item--an eight ounce plastic container of whole dates. Chapin paid Hadley Date Gardens of Thermal, Calif., about 87 cents for them, according to Hadley sales manager Sean Dougherty. In an accounting intended to support the claim that the gift pack is worth nearly $15, Chapin assigns a $1.99 "retail value" to the dates.
 
 
 64
 "Keep in a cool place," recipients are instructed on the lid of the Hadley's container of dates. According to Defense Department shipping instructions, however, "any food items must be able to withstand seven to 10 days' transit in heat of 100 degrees and even after delivery must continue to withstand similar temperatures."
 
 
 65
 It might be easier for GIs to pick dates off a nearby date palm. Saudi Arabia, the world's leading date producer and exporter, grew 596,000 tons of them last year, according to the U.S. Department of Agriculture's Foreign Agricultural Service.
 
 
 66
 For one last time, all of this is true, except that plaintiffs paid only 76, rather than 87, cents for each package of dates. Plaintiffs nonetheless assert that these truths imply that putting dates in the Gift Pacs was absurd, thus making them look ridiculous. Unfortunately for plaintiffs, absurdity or ridiculousness are not concepts susceptible of being false, and even if these implications were intended, they cannot be libelous.[12] Moreover, these paragraphs were not labeled as false in the complaint, and plaintiffs may not belatedly rely on them. Phantom Touring, 953 F.2d at 728.
 
 IV.
 
 67
 Notwithstanding the non-actionability, in isolation, of the various statements we discussed in Part III, we would err if we did not consider the article as a whole. A magnifying glass is no aid to appreciating a Seurat, and the pattern of a complex structure is often discernable only at some distance. Our impression as readers of the entire article matches the district court's, and we cannot improve upon its description (787 F.Supp. at 567-568, footnotes omitted):
 
 
 68
 Fundamentally, the Greve article raises questions about the Gift Pac project. In the Court's view, it is a story constructed around questions, not conclusions. But the mere raising of questions is, without more, insufficient to sustain a defamation suit in these circumstances. Questions are not necessarily accusations or affronts. Nor do they necessarily insinuate derogatory answers. They may simply be, as they are here, expressions of uncertainty. The Greve article advances alternative answers to the questions it raises, presenting both favorable and unfavorable views, but does not ultimately adopt any particular answer as correct. From this, a reasonable reader would not be likely to conclude that one answer is true and the other false. Language of ambiguity and imprecision permeates the article, significantly coloring its tone....
 
 
 69
 * * * * * *
 
 
 70
 ... Here, Chapin and HHV affirmatively and intentionally placed themselves in the public eye. Indeed, the success of the Gift Pac project depended on public awareness and support. Gift Pac promotional materials proclaim the vast extent of HHV's fundraising, several million dollars having already been raised. The materials also claim for HHV efficient and judicious use of the contributions. The Gift Pac literature describes elaborate and extensive access to media, including television and radio advertising and talk shows. Chapin and HHV knowingly and purposefully thrust themselves into two significant matters of public concern: the national response to American military activities in the Persian Gulf and the accountability and integrity of charitable organizations. By so doing, they invited attention and comment about their efforts. Although not an invitation to libel, it was, in the circumstances of this case, properly an invitation to investigate and question. That is all Greve did.
 
 
 71
 The judgment of the district court is affirmed.[13]
 
 
 72
 AFFIRMED.
 
 APPENDIX I
 
 73
 A gift for GIs that may not be such a treat
 
 By Frank Greve
 Inquirer Washington Bureau
 
 74
 WASHINGTON--While many American businesses are donating products to GIs stationed in Saudi Arabia for the holidays, a widely promoted charity is charging hefty mark-ups on goods it ships to them.
 
 
 75
 The drive, called "G.I. Gift Pac," promises to "make every effort" to deliver by Christmas what ads and telephone order takers describe as $15 worth of "cookies and candy, dried fruit, tasty nuts and other holiday treats." Contributors pay $15 for one box or $25 for two. It costs $6 more for each delivery to a specific G.I.
 
 
 76
 The wildly successful project, promoted in television and newspaper advertising, already has 170,000 gift packs en route to the Persian Gulf via military cargo ships, according to the packager, Precise Kit Promotions Inc. of Ho-Ho-Kus, N.J. Sales of up to 500,000 are projected, the packager said.
 
 
 77
 But one question is hard to answer: Who will benefit more from the project--GIs or veteran charity entrepreneur Roger Chapin of San Diego and Falls Church, Va., the organizer of the campaign?
 
 
 78
 Chapin's previous venture was an anti-drug crusade that raised $7.1 million in 1989, spent $6.8 million of it on direct mail, and ended the year with a negative bank balance of $39,486, according to Internal Revenue Service records. Chapin declined to be interviewed about the "Gift Pac."
 
 
 79
 Other people, however, raised questions about the "G.I. Gift Pac" effort, which is being carried out under the auspices of another charity organized by Chapin, Help Hospitalized Veterans.
 
 Among the problems:
 
 80
 . Telephone order takers don't tell contributors this, but the last shipment likely to reach the Persian Gulf before Christmas sailed Nov. 27, according to Steve Gould, president of Precise Kit Promotions, which assembles Chapin's gift packs.
 
 
 81
 . Three eminent retired generals, William C. Westmoreland, Victor Krulak and George Patton 3d, are named as "friends" on letterheads used in "Gift Pac" promotional material. But all three, in telephone interviews, said they had no knowledge of the effort and recalled no association with Chapin.
 
 
 82
 . The wholesale value of a "Gift Pac" is about $8, according to grocery buyers. Chapin, in a promotional new conference held on Oct. 30, said he'd bought at prices "below wholesale."
 
 
 83
 . With the Defense Department picking up the costs of shipping the gift packs from Port Elizabeth, N.J., to the Persian Gulf, and "many major television and radio stations" contributing advertising time, according to Chapin, it is not clear where the rest of the money goes. Gould said he charges $1 for packaging, and the trucking bill to Port Elizabeth adds 18 cents.
 
 
 84
 Bottom line: Chapin's costs for the $15 gift packs appear to be under $10. In a snack-food industry where normal markups are about 35 percent, Chapin's charity seems to be posting better than 50 percent.
 
 
 85
 Chapin declined to answer written questions about all these issues, saying earlier reporting about his anti-drug effort, Citizens for a Drug Free America, has been unfair.
 
 
 86
 He has made conflicting statements about the handling of possible surpluses from the "Gift Pac" drive. "Gift Pac" promotional material distributed this fall said surpluses, if any, would go to Chapin's Help Hospitalized Veterans, a provider of craft kits to VA hospitals. In a brief conversation this week, Chapin said surpluses would be used to buy more gift packs or possibly be donated to the USO, a military charity.
 
 
 87
 "There was some discussion of that, but only if we were partners in the project. We are not partners in the project," said Chapman Cox, president and chief executive officer of the USO.
 
 
 88
 "We do not participate in their solicitations and do not make representations about their legitimacy," Cox said. "I cannot speak at all for any financial accountability, or the cost or the value of the goods. That's their responsibility, not ours."
 
 
 89
 "I just hope that the cost reports of $14 or more per kit are, in fact, true," said Rep. Fortney H. "Pete" Stark (D., Calif.), a member of the House Select Committee on Narcotics, who was sharply critical of Chapin's earlier anti-drug effort. "No one should line their pockets by playing on the sentiments of the holiday season."
 
 
 90
 TV personality Art Linkletter, spokesman for the "Gift Pac" campaign in its advertising, said in a telephone interview that he had "been doing things with Richard [sic] Chapin for several years."
 
 
 91
 "I'm not a part of his organization, but I believe in what he's doing," Linkletter said. "I know he's a good guy. I'm betting on his record."
 
 
 92
 The issue of the gift pack's value is summed by what Chapin says is its most expensive item--an eight-ounce plastic container of whole dates. Chapin paid Hadley Date Gardens of Thermal, Calif., about 87 cents for them, according to Hadley sales manager Sean Dougherty. In an accounting intended to support the claim that the gift pack is worth nearly $15, Chapin assigns a $1.99 "retail value" to the dates.
 
 
 93
 "Keep in a cool place," recipients are instructed on the lid of the Hadley's container of dates. According to Defense Department shipping instructions, however, "any food items must be able to withstand seven to 10 days' transit in heat of 100 degrees and even after delivery must continue to withstand similar temperatures."
 
 
 94
 It might be easier for GIs to pick dates off a nearby date palm. Saudi Arabia, the world's leading date producer and exporter, grew 596,000 tons of them last year, according to the U.S. Department of Agriculture's Foreign Agricultural Service.
 
 
 95
 What's in typical 'G.I. Gift Pac'
 
 
 96
 . Hadley's whole dates, 8 oz.
 
 
 97
 . Pepperidge Farm cookies, 7.7 oz.
 
 
 98
 . Eagle honey roasted nuts, 5 oz.
 
 
 99
 . Pringles potato chips, 7 oz.
 
 
 100
 . Del Monte raisins, 6 oz.
 
 
 101
 . Duncan Hines cookies, 11 oz.
 
 
 102
 . Brach's hard candies, 3 oz.
 
 
 103
 . Pepperidge Farm goldfish, 6 oz.
 
 
 104
 . Cornnuts corn snacks, 6 oz.
 
 
 105
 . Sunline Sweet Tarts, 2 oz.
 
 APPENDIX II
 
 106
 [WB]Charity charging hefty markup in "G.I. Gift Pac" promotion
 
 
 107
 (In 3rd graf. HoHoKus, N.J., is correct.)
 
 
 108
 (PHOTO: details below)
 
 
 109
 (HAS TRIM)
 
 By Frank Greve
 Knight-Ridder Newspapers
 
 110
 WASHINGTON--While many American businesses are donating their products to GIs stuck in Saudi Arabia for the holidays, a widely promoted charity is charging hefty mark-ups on goods it ships to them.
 
 
 111
 The drive, called "G.I. Gift Pac," promises to "make every effort" to deliver by Christmas what ads and telephone order takers describe as $15 worth of "cookies and candy, dried fruit, tasty nuts and other holiday treats." Contributors pay $15 for one box, $25 for two, $6 more for each delivery to an individual G.I.
 
 
 112
 The wildly successful project, promoted in heavy TV and newspaper advertising, already has 170,000 gift packs en route to the Persian Gulf via military sealift, according to the packager, Precise Kit Promotions Inc. of HoHoKus, N.J. Sales of up to 500,000 are projected, the packager said.
 
 
 113
 But the question of who will benefit more from the project--GIs or veteran charity entrepreneur Roger Chapin of San Diego and Falls Church, Va., the organizer of the campaign--is hard to answer.
 
 
 114
 Chapin's previous venture was an anti-drug crusade that raised $7.1 million in 1989, spent $6.8 million of it on direct mail, and ended the year with a negative bank balance of $39,486, according to Internal Revenue Service records. He declined to be interviewed.
 
 
 115
 Other sources, however, raised serious questions about the "G.I. Gift Pac" effort, which is being carried out under the auspices of another charity organized by Chapin, Help Hospitalized Veterans.
 
 Among the problems:
 
 116
 Telephone order takers don't tell contributors this, but the last shipment likely to reach the Persian Gulf before Christmas sailed Nov. 27, according to Steve Gould, president of Precise Kit Promotions, which assembles Chapin's gift packs.
 
 
 117
 Three eminent retired generals, William C. Westmoreland, Victor Krulak and George Patton 3d, are named as "friends" on letterheads used in "Gift Pac" promotional material. The three, in telephone interviews, said they had no knowledge of the effort. Westmoreland and Patton recalled no association with Chapin.
 
 
 118
 Although some retailers in monopoly markets might charge up to $15 for the snacks in the gift pack, their wholesale value is about $8, according to grocery buyers. Chapin, in a promotional press conference held on Oct. 30, said he'd bought at prices "below wholesale."
 
 
 119
 With the Defense Department picking up the costs of shipping the gift packs from Port Elizabeth, N.J. to the Persian Gulf, and "many major television and radio stations" contributing advertising time, according to Chapin, it is not clear where the rest of the money goes. Gould charges $1 for packaging, he said in an interview, and the trucking bill to Port Elizabeth adds 18 cents.
 
 
 120
 Bottom line: Chapin's costs for the $15 gift packs appear to be under $10. In a snack-food industry where normal markups are about 35 percent, Chapin's charity seems to be posting better than 50 percent.
 
 
 121
 Chapin declined to answer written questions about all these issues, saying Knight-Ridder had been unfair in earlier reporting about his drug war effort, Citizens for a Drug Free America, has been unfair.
 
 
 122
 Chapin has made conflicting statements about the handling of possible surpluses from the "Gift Pac" drive. "Gift Pac" promotional material distributed this fall said surpluses, if any, would go to Chapin's Help Hospitalized Veterans, a provider of craft kits to VA hospitals. In a brief conversation this week in which he declined to offer further comment, Chapin said surpluses would be used to buy more gift packs or possibly be donated to the USO, a military charity.
 
 
 123
 "There was some discussion of that, but only if we were partners in the project. We are not partners in the project," said Chapman Cox, president and chief executive officer of the USO, a respected military charity.
 
 
 124
 The United States is assisting in delivering "Gift Pacs" to Saudi Arabia, Cox said. "But we do not participate in their solicitations and do not make representations about their legitimacy. I cannot speak at all for any financial accountability, or the cost or the value of the goods. That's their responsibility, not ours.""I just hope that the cost reports of $14 or more per kit are, in fact, true," said Rep. Fortney H. "Pete" Stark, D-Calif., a member of the House Select Committee on Narcotics, who was sharply critical of Chapin's earlier drug war effort. "No one should line their pockets by playing on the sentiments of the holiday season."
 
 
 125
 TV personality Art Linkletter, spokesman for the "Gift Pac" campaign in its advertising, said in a telephone interview that he had "been doing things with Richard [sic] Chapin for several years." "I'm not a part of his organization, but I believe in what he's doing," Linkletter said. "I know he's a good guy. I'm betting on his record."
 
 
 126
 The issue of the gift pack's value is summed by what Chapin says is its most expensive item--an eight-ounce plastic container of whole dates. Chapin paid Hadley Date Gardens of Thermal, Calif., about 87 cents for them, according to Hadley sales manager Sean Dougherty. In an accounting intended to support the claim that the gift pack is worth nearly $15, Chapin assigns a $1.99 "retail value" to the dates.
 
 
 127
 "Keep in a cool place," recipients are instructed on the lid of the Hadley's container of dates. According to Defense Department shipping instructions, however, "any food items must be able to withstand seven to 10 days' transit in heat of 100 degrees and even after delivery must continue to withstand similar temperatures."
 
 
 128
 It might be easier for GIs to pick dates off a nearby date palm. Saudi Arabia, the world's leading date producer and exporter, grew 596,000 tons of them last year, according to the U.S. Department of Agriculture's Foreign Agricultural Service.
 
 WIDENER, Circuit Judge, dissenting:
 
 129
 I respectfully dissent.
 
 
 130
 Most readers of opinions do not refer to appendices while reading the opinion. At the risk of repetition and hopefully in order to have the reader's attention while so engaged, I reprint as the next two pages of this effort the newspaper article sued upon. The wire service article I leave to the appendix to the majority opinion.NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 131
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 132
 Our review of the district court's decision to dismiss a complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6) is de novo. See Schatz v. Rosenberg, 943 F.2d 485, 489 (4th Cir.1991). We must base our decision solely upon the legal sufficiency of the complaint, and we must construe all factual allegations "in the light most favorable to plaintiff." 943 F.2d at 489 (citation omitted). "We have long held 'that a motion to dismiss for failure to state a claim for relief should not be granted unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of his claim.' " Rogers v. Jefferson-Pilot Life Ins. Co., 883 F.2d 324, 325 (4th Cir.1989). I am of opinion that both the majority and the district court decided incorrectly the motion to dismiss. I would reverse the decision and remand the case for further proceedings.
 
 I.
 
 133
 I think the plaintiffs, Roger Chapin and Help Hospitalized Veterans, Inc. (HHV), state in their amended complaint, filed August 22, 1991, a cause of action in libel. While the complaint at the outset of the case did not single out specific quotes from the Greve article[1] alleged to be false, the complaint does allege that the Greve article contains false and defamatory statements and that the article as a whole is defamatory by implication.[2] In their motion to dismiss, the defendants claim that the allegedly defamatory statements either constitute opinion that cannot be proved false or are not capable of a defamatory meaning and that the article in its entirety is not defamatory by implication.[3]
 
 
 134
 Under Virginia law defamation requires the publication of an actionable statement concerning the plaintiff. Because there is no question of publication in this instance, the only issue properly before this court is whether or not the Greve article is actionable under Virginia law.[4] For the Greve article to be actionable under Virginia law, it must be both false and defamatory. See Gazette, Inc. v. Harris, 229 Va. 1, 325 S.E.2d 713 cert. denied, 472 U.S. 1032, 105 S.Ct. 3513, 87 L.Ed.2d 643 (1985). However, because we must accept the plaintiffs' allegations of falsity when ruling on a motion to dismiss, the sole issue for us to consider is whether or not the Greve article is defamatory under Virginia law.
 
 
 135
 In Virginia, a statement is defamatory if it "tends to injure the reputation of the party, to throw contumely, or to reflect shame and disgrace upon [the party], or to hold [the party] up as an object of scorn, ridicule or contempt." Adams v. Lawson, 58 Va. (17 Gratt.) 250, 255-56 (1867). If a defamatory statement injures a person in his or her trade or profession, then the statement is actionable per se. See Carwile v. Richmond Newspapers, 196 Va. 1, 82 S.E.2d 588, 591 (1954); Swengler v. ITT Corporation, 993 F.2d 1063 (4th Cir.1993). If a defamatory statement is not actionable per se, then the statement must "occasion a person special damage" to be actionable. 82 S.E.2d at 591.
 
 
 136
 When determining whether a statement is defamatory as a matter of law in Virginia, a court must employ the following principles:
 
 
 137
 [I]t is a general rule that allegedly defamatory words are to be taken in their plain and natural meaning and to be understood by courts and juries as other people would understand them, and according to the sense in which they appear to have been used. In order to render words defamatory and actionable it is not necessary that the defamatory charge be in direct terms but it may be made indirectly, and it matters not how artful or disguised the modes in which the meaning is concealed if it is in fact defamatory. Accordingly, a defamatory charge may be made by inference, implication or insinuation.... In determining whether the words and statements complained of in the instant case are reasonably capable of the meaning ascribed to them by innuendo, every fair inference that may be drawn from the pleadings must be resolved in the plaintiff's favor. However, the meaning of the alleged defamatory language can not, by innuendo, be extended beyond its ordinary and common acceptation. The province of the innuendo is to show how the words used are defamatory, and how they relate to the plaintiff, but it can not introduce new matter, nor extend the meaning of the words used, or make that certain which is in fact uncertain.
 
 
 138
 Carwile, 82 S.E.2d at 591-92 (citations omitted). Under this framework, the district court correctly stated the dispositive question as "whether or not a reasonable factfinder could conclude that the article or statements in the article state or imply, in their plain and natural sense, the defamatory meanings ascribed to them by plaintiffs in their complaint." Chapin, 787 F.Supp. at 564, citing Carwile, 82 S.E.2d at 591-92 and Milkovich v. Lorain Journal Co., 497 U.S. 1, 21, 110 S.Ct. 2695, 2707, 111 L.Ed.2d 1 (1990).
 
 
 139
 Although in this instance the district court properly recited the law as to when words are defamatory in Virginia and asked the appropriate dispositive question, I am of opinion that it then answered the question incorrectly. Under the above framework, the district court concluded it was "not persuaded that the Greve article, taken as a whole and considering the plain and natural meaning of its language, [can] reasonably be read as directly stating or indirectly implying the defamatory meanings ascribed by Chapin in his complaint." 787 F.Supp. at 568. The district court reached this conclusion by individually analyzing the allegedly defamatory statements in light of the article taken as a whole. See 787 F.Supp. at 564-67. However, in utilizing this approach, the district court at best only answered one half of the dispositive question. While the district court concluded that the statements in the article did not state or imply the defamatory meanings ascribed to them by plaintiffs in their complaint it did not determine if the article taken as a whole stated or implied the defamatory meaning ascribed to it by the plaintiffs in their complaint.[5]
 
 
 140
 Regardless of how the district court ruled on the statements individually,[6] I am of opinion that people reasonably could understand the article, taken in its plain and natural meaning, to be defamatory. The article begins by stating that Chapin is "charging hefty mark-ups on goods" contained in his Gift Pacs while "many American businesses are donating products to GIs stationed in Saudi Arabia for the holidays." The same article again refers to the alleged price disparity by stating that Chapin's charity is "posting [mark-ups] better than 50 percent" while the snack-food industry "normal markups are about 35 percent."
 
 
 141
 The article also asks: "Who will benefit more from the program--GIs or veteran charity entrepreneur Roger Chapin ... the organizer of the campaign." It quotes "Rep. Fortney H. 'Pete' Stark (D-Calif.), a member of the House Select Committee on Narcotics, who was sharply critical of Chapin's earlier anti-drug effort," in speaking of Chapin and the charity as follows:
 
 
 142
 "I just hope that the cost reports of $14 or more per kit are, in fact, true. No one should line their pockets by playing on the sentiments of the holiday season."
 
 
 143
 The article also refers to the project as "wildly successful" and "already has 170,000 gift packs en route to the Persian Gulf" with "sales of up to 500,000 are projected" according to the packager, one Precise Kit Promotions.
 
 
 144
 Resolving every fair inference in favor of the plaintiffs, as we must, I am of opinion that a person reasonably could understand this article as insinuating and implying that "Chapin and HHV together defrauded the public, operated a 'bogus charity,' and profiteered from the war, and that Chapin himself was a corrupt businessman who gained personal financial benefit from the Gift Pac project." Chapin, 787 F.Supp. at 561. Accordingly, I would reverse the district court's decision and remand the case for further proceedings.
 
 II.
 
 145
 While the foregoing is sufficient reason upon which to reverse the district court's decision, the method used by the majority in reaching its decision equally does not withstand more than casual analysis. First, the majority's holding that the defendants are protected "from any actionable implication that may be contained in Representative Stark's comments" (Op. at 1097) is contrary to Virginia law. Second, the majority improperly considered the truth or falsity of the allegedly defamatory statements. Third, the majority improperly used extraneous facts to support its conclusions that several of the allegedly defamatory statements were in fact true. Fourth, the majority failed to determine whether or not the statements were defamatory under Virginia law, relying instead on District of Columbia law not in accord with present Virginia law.
 
 A.
 
 146
 It is a settled principle in Virginia that a newspaper assumes the risk that the information it prints from other sources is true. "The correctness of this information was a risk assumed." Norfolk Post Corporation v. Wright, 140 Va. 735, 125 S.E. 656, 657 (1924). However, the majority ignores that leading case on the subject when considering the actionability of Representative Stark's comments contained in the Greve article. The majority first states: "This quote comes closer than anything else in the article to insinuating wrongdoing, and hence presents our most difficult inquiry." The majority then states:
 
 
 147
 Even if we assume that Representative Stark leveled a defamatory charge against plaintiffs, it was certainly newsworthy that the charge was made. At common law, each republication of a libel was a separate tort. Literal adherence to this rule would sap the vigor of public debate, and could frighten the press from even reporting to the public the few debates that might occur. For these reasons, the republication rule has been severely limited by the courts.
 
 
 148
 Following this statement, the majority proceeds with an analysis of the fair report privilege and holds that the privilege protects the defendants because it is "a fair and accurate report of the public remarks of a member of Congress."Although Virginia does recognize a doctrine of fair comment similar to the fair report privilege, in Virginia it is not a privilege, but "a common right of every citizen to comment upon or criticize a matter of public concern." By analogy some of the same rules apply as to a privileged occasion. James v. Haymes, 160 Va. 253, 168 S.E. 333, 336 (1933). The application of the doctrine of fair comment in Virginia is straightforward and uncomplicated. Where there is room for doubt whether the language used is out of proportion to the occasion, the jury must be permitted to pass upon the question. James, 168 S.E. at 336. In James, the Court rejected the theory that a misstatement of facts made in good faith from proper motive and with reasonable ground for belief in its truth is necessarily a good defense. It cited its own precedent of Williams Printing Co. v. Saunders, 113 Va. 156, 73 S.E. 472 (1912) as well as earlier cases by Justice Holmes in Burt v. Advertiser Newspaper Co., 154 Mass. 238, 28 N.E. 1 (1891) and Chief Justice Taft in Post Publishing Co. v. Hallam, 59 F. 530 (6th Cir.1893), and held that if the facts upon which the comment or criticism sought to be excused do not exist, the foundation fails and thus the defense is not available. James, 168 S.E. at 335, 336. To place James in its correct context, it should be noted that James was a case in which a newspaper had falsely said of a highway contractor alluded to by name "that he was then doing slow work, that the road in 1930 was closed because of his slow work, that as a road contractor he employed dilatory tactics, and the implication was that he was doing this for the purpose of securing greater profit than he was legally entitled to." These words were held to be libelous. James, 168 S.E. at 336.
 
 
 149
 Instead of applying the Virginia doctrine of fair comment, however, it being obvious that such would not apply in this case if the facts in the article were false as alleged, the majority in this state law defamation case has applied what it considers to be a federal fair report privilege. It did not even consider the fact that we have held that the allied official report privilege is largely a creation of state defamation law and that we have explicitly applied the law of the State where the statements were made. Lee v. Dong-A Ilbo, 849 F.2d 876 (4th Cir.1988), cert. denied, 489 U.S. 1067, 109 S.Ct. 1343, 103 L.Ed.2d 812 (1989). It relied on Reuber v. Food Chemical News, Inc., 925 F.2d 703, 712-13 (4th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991) (en banc). In Reuber, we held that publication of a letter of reprimand from the supervisor of a plaintiff, both the supervisor and the plaintiff being employed by a government contractor doing government work for the National Institute of Health, was subject to a fair report privilege as being "based on government reports or actions." We reasoned that "government documents served as 'the basic data of government operations.' " Reuber, 925 F.2d at 712. In this case, the fair report privilege outlined in Reuber is no less inapplicable than the fair comment doctrine of Virginia. Extending a fair report privilege to the quotation of a Congressman's off-hand slander uttered by the Congressman in other than official context is no less than giving the Congressman a license to slander by virtue of his office and the newspaper a license to commit libel by repetition of the slander. This is just what Norfolk Post forbids. I suggest the majority has come up with no contrary authority.
 
 
 150
 It also should be mentioned that the majority's justification of the repetition of Congressman Stark's slander, as it cleansed the statement of malice as a matter of law by the inclusion of a favorable statement from Art Linkletter, is nothing more than the old dodge of a contrived defense to slander by Jack saying to John, "Did you hear Paul robbed the grocery store?" and when John said no, he hadn't heard of it, Jack would say "Well, I haven't heard of it either. Paul is a fine man." I do not believe this is a defense to malice as a matter of law, as the majority holds, in any jurisdiction in the United States, state or federal. The Congressman's published credentials indeed, speak as loudly for the newspaper's support of his competence as a speaker as his previous statements do for his bias as the majority has indicated.B.
 
 
 151
 Formerly, in an action of defamation, a defendant could not rely upon truth, either in mitigation of damages or as a complete bar, unless he asserted truth as an affirmative defense under a special plea of justification. See Williams Printing Co. v. Saunders, 113 Va. 156, 73 S.E. 472, 476 (1912); Newell, Slander and Libel § 575 (4th ed. 1924). However, truth in the ordinary case is no longer precisely the same affirmative defense that it once was in Virginia because the plaintiff now carries the initial burden of proving falsity. See Gazette, 325 S.E.2d at 724-25.
 
 
 152
 When ruling upon a motion to dismiss, a court must take the plaintiff's allegations of fact as truth. In this case, the plaintiffs alleged that certain statements contained in the Greve article were factually false. Therefore, for purposes of the motion to dismiss, the plaintiffs have carried their burden of proof, and the truth of the statements is no longer an issue for us to consider. While both I and the district court, see Chapin, 787 F.Supp. at 562, have adhered to this procedural requirement, the majority has not done the same in reaching its decision.[7]
 
 
 153
 The majority addresses the allegedly defamatory statements in 10 clearly numbered sections. Op. at 1092-1097. In seven of these sections the majority relies either in whole or in part on truth to find that the statements are not defamatory.[8] Because the majority continually relies on truth in these instances, it either never addresses or improperly addresses the dispositive question of whether or not the statements are defamatory under Virginia law. Therefore, the majority's analysis cannot sustain its decision to affirm the district court's granting of the motion to dismiss.
 
 C.
 
 154
 It is well settled "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); see Johnson v. Mueller, 415 F.2d 354, 355 (4th Cir.1969) (citing Conley). Furthermore, when considering a motion to dismiss for failure to state a claim, a court properly should consider only the legal sufficiency of the complaint. See Schatz, 943 F.2d at 489. Therefore, when reviewing a district court decision to grant a motion to dismiss, it is quite inappropriate for a court of appeals to rely upon facts outside of the complaint that were not considered by the district court.[9]
 
 
 155
 In at least two specific instances, the majority goes beyond the face of the complaint and relies upon facts not considered by the district court.[10] In the first instance the majority discusses facts which show that the "hefty mark-up" complained of in the Greve article actually was less hefty than the "true" mark-up on the Gift Pacs. Op. at 1093. The majority then uses this analysis to claim "Greve's opinion [of the "hefty mark-up"] was certainly defensible." When the district court passed upon the same statement, it held that "hefty mark-up" is a "subjective value judgment." Chapin, 787 F.Supp. at 565 n. 14. Unlike the majority, however, the district court did not go beyond the facts alleged in the complaint to prove that the mark-up was indeed "hefty." Indeed the majority even suggests that the use of the word "hefty" may have been unfair. Op. at 1092, n. 7.
 
 
 156
 In the second instance the majority cites salary figures that both Chapin and his wife receive from various charities for which they work. Op. at 1093, n. 9. The majority uses these figures to show that Chapin and his wife's combined salaries have "increased steadily and substantially," thus proving that Greve's assertion that "Chapin benefitted financially from the Gift Pac program [was] substantially true." Op. at 1093. When the district court addressed the same statement of "Who Will Benefit More," it stated that "financial benefit for a charitable fundraiser in and of itself is not defamatory, [and] Chapin admits [in his complaint][11] that he draws a salary for his work from HHV." Chapin, 787 F.Supp. at 565. While the district court held that drawing a salary from a charity is a benefit received from that charity, it, unlike the majority, did not go beyond the complaint to prove that Chapin in fact benefitted because his salary from the charity increased "steadily and substantially."D.
 
 
 157
 While the majority properly states that the issue on appeal is whether or not the Greve article is actionable as a matter of law, it does not analyze this question under Virginia law. Instead, it provides:
 
 
 158
 Although Virginia's common law of libel governs this diversity case, the First Amendment's press and speech clauses greatly restrict the common law where the defendant is a member of the press, the plaintiff is a public figure, or the subject matter of the supposed libel touches on a matter of public concern.
 
 
 159
 Op. at 1090-1091. The majority then proceeds to analyze the Greve article under District of Columbia law. In doing this, the majority improperly imposes a standard of proof higher than that required to make a statement actionable in Virginia. Obviously relying on its fact finding of truth, and explicitly on White v. Fraternal Order of Police, 909 F.2d 512 (D.C.Cir.1990), the majority states: "[A] libel-by-implication plaintiff must make an especially rigorous showing where the expressed facts are literally true. The language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference." Op. at 1092. This simply is not an accurate statement of the law of libel-by-implication in Virginia. Under Virginia law the plaintiff must only prove that the language reasonably imparts the false innuendo. See Carwile v. Richmond Newspapers, 196 Va. 1, 82 S.E.2d 588, 591-92 (1954). Thus, contrary to the majority holding, Virginia does not require plaintiffs to additionally prove that the author intends or endorses the inference.
 
 
 160
 Finally, and for example, Virginia law requires that allegedly defamatory words are "to be understood by courts and juries as other people would understand them, and according to the sense in which they appear to have been used." Carwile, 82 S.E.2d at 591-92 (emphasis added). When considering the statement "Wholesale Value is About $8" the majority states: "Plaintiffs again complain that the reporting of these true facts is intended to convey the false impression that they lined their pockets. We disagree. The article simply invites inquiry about the mark-up." (emphasis added) Op. at 1095. In reaching its conclusion, the majority should have asked whether the plaintiffs' assertion was a reasonable inference arising from the words "as other people would understand them according to the sense in which they appear to have been used." Carwile, 82 S.E.2d at 592. Thus, I suggest the majority's conclusion that it disagrees with the assertion is irrelevant.
 
 III.
 
 161
 In sum, the procedural and lesser errors aside for the moment but not forgiven, the article in question in this case which charged that "while many American businesses are donating products to GIs stationed in Saudi Arabia for the holidays, a widely promoted charity [the plaintiffs] is charging hefty mark-ups on goods it ships to them," and adds to that the comment of Congressman Stark, in speaking of the plaintiffs, that "no one should line their pockets by playing on the sentiments of the holiday season" is just as or far more libelous than the article in the Danville Register[12] that a building contractor was slow and was making a greater profit than he was entitled to, and the article in the Richmond Times Dispatch[13] that suggested that a complaint might be filed with the Virginia State Bar against Howard Carwile for making corruption charges against the Richmond Police Department which were not corroborated by a grand jury. In both James and Carwile, the Virginia Supreme Court of Appeals held the words to be libelous. Under Erie, we cannot simply fail to follow those decisions.
 
 
 162
 It is not the proper function of the inferior federal courts to provide a sanctuary for libel and slander as the majority does here.
 
 
 163
 I would reverse.
 
 
 
 [1]
 A typical Gift Pac included dates, cookies, honey-roasted nuts, potato chips, raisins, hard candies, "Goldfish," "Cornnuts," and "Sweet Tarts."
 
 
 [2]
 The Philadelphia Inquirer is the name of a newspaper, but is not a legal entity
 
 
 [3]
 Neither party challenges the district court's choice of law. 787 F.Supp. at 562 n. 6
 
 
 [4]
 The defendants are obviously members of the press, and the district court identified two matters of public concern addressed by the article--the public response to American military involvement in the Persian Gulf, and the integrity of charities soliciting funds from the public. Chapin, 787 F.Supp. at 561 n. 5. The district court did not decide, but noted that the "limited record ... strongly suggests," that plaintiffs are "public figures." Id. at 568 n. 21. The district court's caution was unnecessary. The complaint extols HHV's nationwide charitable activities and their long (twenty years) duration. Chapin himself complains of the injury he has suffered to his "public" reputation as "an honest fund-raiser and charitable leader." In light of this circuit's precedent involving libel suits by charities, plaintiffs' status as "public figures" is irretractably admitted on the face of the complaint. See National Foundation for Cancer Research, Inc. v. Council of Better Business Bureaus, Inc., 705 F.2d 98, 101 (4th Cir.) (a charity that "thrusts itself into the public eye" through "massive solicitation efforts" is a public figure), cert. denied, 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983)
 
 
 [5]
 The First Amendment requires that public figures prove by clear and convincing evidence that a false publication on a matter of public concern was made with "actual malice," which does not refer to ill will, but rather to knowledge of falsity or reckless disregard of a "high degree of awareness of ... probable falsity." Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 667, 109 S.Ct. 2678, 2685, 105 L.Ed.2d 562 (1989), quoting Garrison v. Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964). States may, however, permit private individuals to recover compensatory damages on a lesser showing of fault. Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)
 
 
 [6]
 "Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned." Garrison, 379 U.S. 64, 74, 85 S.Ct. 209, 215. See also Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 776, 106 S.Ct. 1558, 1563, 89 L.Ed.2d 783 (1986) (holding unconstitutional a Pennsylvania statute that placed the burden of proving truth on a libel defendant)
 
 
 [7]
 A "mark-up" is "the gross profit to cover overhead expenses and provide net profit." Webster's Third New International Dictionary (1976). Thus, the plain and natural meaning of "mark-up" leaves ample room to accommodate plaintiffs' innocent explanation of its heftiness--overhead absorbed it all
 
 
 [8]
 We alter this familiar quote from Gertz, 418 U.S. at 339, 94 S.Ct. at 3006, to express its corollary
 Contents $5.50
Packaging 1.42
Shipping .25
Direct Mail Solicitation 5.83
TV and Print Ads 2.10
Miscellaneous .51
 
 
 [9]
 The Chapin household's combined income from these salaries increased from $53,582.85 in 1986 to $161,001.40 in 1991. In the last year of this period, which included the Gift Pac campaign, the increase was $28,000, including a special $5,000 fee charged by Mrs. Chapin directly to the Gift Pac program for her authorship of two newsletters
 
 
 [10]
 Because Rep. Stark did not make his remark on the House floor, the statement is not entitled to the absolute privilege conferred by the Speech and Debate Clause (U.S. Const., art. I § 6). Hutchinson v. Proxmire, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979)
 
 
 [11]
 A nuance of the "accurate" element of the privilege is illustrated by Greenbelt. The "blackmail" charge, when made, was actually "rhetorical hyperbole," rather than an assertion that the crime of blackmail had been committed. Because the newspaper article properly conveyed the sense in which the term was used, it was accurate
 
 
 [12]
 Of course, where absurdity or ridiculousness is the effect of a false assertion of fact, the concepts would be relevant to the defamation element of the cause of action. However, no degree of absurdity or ridiculousness, standing alone, constitutes a false assertion of fact
 
 
 [13]
 Defendants' motion for leave to file deposition excerpt is granted
 
 
 [1]
 At issue are a wire release written by Frank Greve and the subsequent article as published by Philadelphia Newspapers, a Knight-Ridder Newspaper. For purposes of this dissent, the articles collectively will be referred to as the Greve article
 
 
 [2]
 The complaint states the following as its cause of action:
 
 
 [20]
 The wire release and Inquirer article derived therefrom, each independently and taken as a whole, directly accuses plaintiffs, Chapin and HHV, of dishonesty, profiteering and defrauding the public and preying upon patriotic sentiments to enrich themselves. The wire release and article cast aspersions upon the credibility, integrity and honesty of the plaintiffs, Chapin and HHV, by stating and insinuating that Chapin was cheating and defrauding the public through the Gift Pac project, that he was personally benefitting financially from the project, that he charged hefty mark-ups, that he refused to answer questions put by Greve, that he gave suspiciously conflicting comments about the use of possible surpluses, and used without permission the names of "friends" and sponsors who had no association with Chapin or HHV
 
 
 [22]
 The defendants and each of them participated in the preparation and publication of the false, scandalous and malicious article concerning the plaintiffs. By words and language contained in the publications, ... the defendants and each of them meant and intended to mean and were understood to mean that the plaintiffs, Chapin and/or HHV, were pocketing funds solicited for the Gift Pac, gave the impression that there were little or no fundraising costs, accused Chapin and HHV of overinflating the retail value of the Gift Pac, implied that there was a big profit in the Gift Pac project, that Chapin defrauded the public and that he was dishonest, corrupt, and that HHV was the vehicle used to perpetuate that fraud
 
 
 [23]
 The wire release and the article each employed lies, false statements, innuendoes, half-truths, and unrelated facts as to create in its entirety, ... an appearance of fraud, dishonesty and improprieties by the plaintiffs, [and] falsely creating a picture of plaintiff Chapin as a corrupt businessman, profiteering from the war in the Persian Gulf through a bogus charity, plaintiff HHV
 After the defendants filed their motion to dismiss, the district court held a hearing on October 25, 1991. Although the district court initially had difficulty discerning the exact nature of the plaintiffs' claims, it reached an understanding as to the claims at issue: "We have clarified what the complaint is. It's both a claim of libel by implication and it's a claim that individual statements are false and defamatory...." Because the complaint did not allege that any specific quotes or statements were indeed false, the district court ordered the plaintiffs "to prepare a memorandum detailing with specificity (i) which statements in the article and wire release [were alleged] to be factually false, (ii) which statements [were alleged] to be defamatory by implication, and (iii) which statements [were alleged] to be both factually false and defamatory by implication." Pursuant to this order, the plaintiffs filed a memorandum identifying 15 statements as either factually false or defamatory by implication or both.
 
 
 [3]
 Defendants assert that the article in its entirety is not defamatory by implication in Defendants' Reply to Plaintiffs' Brief in Response to Defendants' Amended Motion to Dismiss filed pursuant to the district court's order dated October 25, 1991
 
 
 [4]
 A third element of defamation, requisite intent, may involve whether or not the plaintiff is a public figure and the concomitant requirements of malice or negligence. This determination is one of fact and is properly before a court on a motion for summary judgment, not a motion to dismiss
 
 
 [5]
 The district court did conclude that the article "taken as a whole" was not defamatory, but did not state why. It found the article merely "embarrassing and annoying."
 
 
 [6]
 While I am of opinion that the district court incorrectly decided that none of the individual statements were defamatory, I need not and do not address these individual statements other than they appear at various places in the opinion, as such a consideration is unnecessary to deny the motion to dismiss
 
 
 [7]
 The majority properly states that on a motion to dismiss in a libel suit, a court must take the plaintiff's allegations of falsity as true for purposes of ruling on the motion. Op. at 1092. However, the majority then brushes aside this requirement because the plaintiffs' complaint "couches its allegations of falsity in vague, conclusory terms...." Op. at 1092. While it is true that the district court did believe this initially, it rectified any vagueness through oral argument and the required submission of further briefs. The district court then reached its decision by considering all of the plaintiffs' allegations of factual falsity as true. See Chapin, 787 F.Supp. at 562. The majority, however, has ignored this requirement on the motion to dismiss and improperly considered the truth or falsity of allegedly defamatory statements simply because it found the complaint only vaguely alleged that the statements were false. It did not consider that the district court had rectified that very matter
 
 
 [8]
 Quotes from the following sections, which correspond with the majority's section numbers, illustrate the majority's improper reliance on truth:
 
 
 [1]
 "HEFTY MARK-UPS"
 The majority states that "hefty" is "the author's opinion of the mark-up ... and is just too subjective a word to be proved false." Op. at 1092. Based on this, the majority concludes that the phrase is not actionable because it does not assert a "provably false fact or factual connotation." Op. at 1092, citing Milkovich v. Lorain Journal Co., 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990).
 
 
 [2]
 "WHO WILL BENEFIT MORE?"
 In considering this question, the majority states that "[a] question can conceivably be defamatory though it must be reasonably read as an assertion of a false fact...." Op. at 1093 (original emphasis). The majority concludes that "even if the question posed by Greve were construed as an assertion that Chapin benefitted financially from the Gift Pac program, the assertion would be substantially true." Op. at 1093.
 In this section the majority also addresses Chapin's contention that the description "veteran entrepreneur" is defamatory. Op. at 1093. While the majority concedes that "the use of the word 'entrepreneur' may be taken by the astute reader as a sarcastic hint that the reporter does not have a high regard for persons who operate 'non-profit' charities at comfortable salaries[,]" the majority concludes that this is not actionable because it is "opinion [that] is incapable of being proved false...." Op. at 1093-1094.
 
 
 [3]
 "NEGATIVE BANK BALANCE"
 Once again the majority considers only the truth or falsity of the allegedly defamatory statements. The majority states throughout this section: "Everything in these statements is true.... [E]ven the implication about which plaintiffs grumble is true.... The truth may sting, but it is the truth nonetheless, and persons who inject themselves into public activities like charity fundraising must accept the public eye." Op. at 1094.
 
 
 [4]
 "PEOPLE RAISED QUESTIONS"
 Again the majority begins by stating that "[e]verything in these paragraphs is true." Op. at 1095.
 
 
 [5]
 "WHOLESALE VALUE IS ABOUT $8"
 The majority quickly dispenses with this by stating "[a]ll true, once again." Op. at 1095.
 
 
 [6]
 "IT IS NOT CLEAR WHERE THE REST OF THE MONEY GOES"
 Once again the majority begins by stating "[w]e do not know how this statement could be false." Op. at 1095.
 
 
 [10]
 DATES TO SAUDI ARABIA--COALS TO NEWCASTLE?
 As is customary, the majority begins by stating: "For one last time, all of this is true, except that the plaintiffs paid only 76, rather than 87, cents for each package of dates." Op. at 1097.
 
 
 [9]
 Although it is permissible for a district court to consider facts outside the pleadings when ruling on a 12(b)(6) motion to dismiss, the district court must convert the action to a Rule 56 motion for summary judgment and give the parties a "reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed.R.Civ.P. 12(b). We have adhered to the "reasonable opportunity" requirement of Rule 12(b)(6). See, Fayetteville Investors v. Commercial Builders, 936 F.2d 1462, 1471 (4th Cir.1991). If we determine that a district court should have converted a 12(b)(6) motion to a Rule 56 motion, we do not convert the 12(b)(6) motion and then rule upon it. Instead, we find that the district court erred and remand to give the parties a reasonable opportunity to present material relevant to a Rule 56 motion. See Fayetteville, 936 F.2d at 1472. While I express no opinion on whether or not the district court should have converted the motion to dismiss to a motion for summary judgment, it is clear that the majority has relied upon material outside of the pleadings that the district court did not consider which is appropriate only on a motion for summary judgment
 
 
 [10]
 The facts relied upon by the majority are contained in Plaintiff Help Hospital Veterans' Responses to Defendant Knight-Ridder, Inc.'s First Set of Interrogatories, dated December 13, 1991. Although part of the Joint Appendix, the district court did not consider these facts in ruling upon the motion to dismiss
 
 
 [11]
 Although Chapin does not admit that he draws a salary in his amended complaint, he does admit it in a deposition attached to Plaintiffs' Brief in Response to Defendants' Amended Motion to Dismiss. This brief was submitted pursuant to a court order and thus was considered by the district court as a part of the pleadings. This deposition does not contain the figures recited in HHV's interrogatory answers and relied upon by the majority
 
 
 [12]
 James, 168 S.E. at 336
 
 
 [13]
 In Carwile, the newspaper reporter had asked a city official whether any action would be taken against Carwile for his having preferred charges which "cast a shadow across the entire Police Department." When the reporter failed to get a definite reply to that "suggestive question," he wrote that "Under the State Code, the State Bar as an administrative agency of the Supreme Court of Appeals may request a court of competent jurisdiction to disbar an attorney for violation of the ethical code governing the professional conduct of attorneys."
 The Supreme Court of Appeals held that this wording was the suggestion "in a veiled but pointed way that ... [Carwile] could and should be subject to disbarment proceedings....", and was libelous. Carwile, 82 S.E.2d at 592.