**John T. MOORE, Plaintiff,**

v.

**PYA MONARCH, LLC, Defendant.**

**No. CIV.A. 2:02CV411.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Nov. 21, 2002.

LeRon William Gilchrist, Sams and Scott, Norfolk, VA, for plaintiff.

James Phillip Naughton, Sara Lynne Berg, Julie W. Spain, Hunton and Williams, Norfolk, VA, for defendant.

### OPINION AND ORDER

MORGAN, District Judge.

This matter comes before the Court on the Defendant's motion for summary judgment. Plaintiff's response was due on October 30, but Plaintiff failed to file any opposition memoranda. At the hearing held on November 13, 2002, Plaintiff did not contest Defendant's motion. For the reasons set forth below, Defendant's motion for summary judgment is **GRANTED**.

### PROCEDURAL BACKGROUND

Plaintiff was employed by the Defendant food distribution company as a mechanic. On or about October 2, 2001, Plaintiff was terminated for misconduct. Plaintiff filed a claim with the Virginia Employment Commission ("the VEC") for unemployment compensation, which was denied. Plaintiff appealed. At the hearing on appeal, the appeals examiner directed the Defendant to submit two written reports regarding the circumstances of Plaintiff's termination, and the Defendant complied. Plaintiff filed suit in state court alleging that the Defendant defamed him by submitting the reports to the VEC. Defendant removed the case to this Court based on diversity jurisdiction and moved for summary judgment. Plaintiff has not filed a response.

### FINDINGS OF FACT[1]

Local Rule 56(B) provides that a brief in support of a motion for summary judgment must provide a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue. Local Rule 56(B) also provides that a brief submitted in response to a motion for summary judgment is to include a listing of all material facts as to which the party contends there is a genuine issue necessary to be litigated.

In accordance with Local Rule 56(B), the Court's findings of fact will be those set forth at pages 2–5 of the Defendant's Memorandum of Law in Support of Defendant's Motion for Summary Judgment. The Court adopts the Defendant's "Statement of Undisputed Facts" in whole because the Plaintiff failed to respond to the motion for summary judgment or file a statement of the facts which he claims are in dispute. The Plaintiff's noncompliance with the requirements set forth in Local Rule 56(B) triggers the consequence set forth in that rule, e.g., the facts identified by the Defendant as material facts as to which there is not genuine issue in its opening brief are admitted. The admitted facts are as follows:

1. PYA Monarch is engaged in the business of food distribution to various service establishments, including restaurants, colleges, universities, and hospitals. (*See* Bennett Aff. ¶ 2). PYA Monarch operates a facility in Virginia Beach at which its delivery vehicles are loaded for distribution. (*Id.*). PYA Monarch employs a number of mechanics at the Virginia Beach facility to handle routine vehicle maintenance and repairs. (*Id.*).

2. In September 2001, Mr. Moore was working for PYA Monarch as a vehicle mechanic at the Virginia Beach facility. (Bennett Aff. ¶ 3). He was working the

---

**1.** As Plaintiff failed to dispute the facts as set forth by the Defendant, the Court adopts the Defendant's "Statement of Undisputed Facts" in whole pursuant to Local Rule 56(B). To the extent of any ambiguity, this opinion views the facts in the light most favorable to the Plaintiff.

second shift, which runs from 3:00 p.m. to 11:30 p.m., Sunday through Thursday. (*Id.*).

3. On Sundays, the lead mechanic reported to work at about 10:00 p.m. (Bennett Aff. ¶ 4). Thus, for most of his Sunday shift, Mr. Moore was alone and unsupervised in the garage. (*Id.*).

4. PYA Monarch's Virginia Beach facility is surrounded by a chain-link fence and the entrance is secured by an electronically-operated gate. (Bennett Aff. ¶ 5). Prior to the September 11, 2001 terrorist attacks, the gate was open between approximately 7 a.m. and 7 p.m., Monday through Friday, and was manned by a security guard between 7 a.m. and 3:30 p.m. (*Id.*). The guard checked each vehicle to ensure that its driver and passenger either had PYA Monarch identification or a business reason to be at the facility. (*Id.*). When the security guard left and the gate was closed, the only way to enter the facility was by scanning an access card at the gate. (*Id.*). All PYA Monarch employees are issued an access card. (*Id.*).

5. After the September 11 attacks, PYA Monarch tightened its security measures and stationed a security guard at the gate 24 hours a day. (Bennett Aff. ¶ 6). During hours that the gate was closed, the guard was stationed outside, but near the gate. (*Id.*). From this vantage point, he/she could readily observe the gate and the surrounding area. (*Id.*). In September, 2001, PYA Monarch obtained guards through a contractor. (*Id.*). The guards were instructed to check identification when the gate was open and to report all suspicious activities that they observed. (*Id.*).

6. On the evening of September 23, 2001, James Davis was assigned by the contractor as the security guard on duty at the front gate. (Bennett Aff. ¶ 7). Mr. Davis completed an incident report that night regarding the activities of a PYA Monarch employee that he felt were suspicious. (*Id.*). The report was provided to PYA Monarch's safety and environmental coordinator, Walter Satchell, who was responsible for facility security. (*Id.*). Mr. Davis's report described several violations of Company policy. (*Id.*). For example, the employee whose activities Mr. Davis observed had allowed unauthorized personnel on Company property and had driven a Company vehicle off-site without authorization. (*Id.*). Mr. Davis also observed the employee attempt to give some unidentified packages to non-employees. Davis suspected that the packages contained Company property. (*Id.*). It was apparent from the activities described in Mr. Davis's report that the employee in question was not working for substantial periods of time during the evening. (*Id.*).

7. Mr. Satchell met with Mr. Davis regarding his report. (Bennett Aff. ¶ 8). After examining photographs of several PYA Monarch employees, Mr. Davis identified Mr. Moore as the employee he had observed involved in the unauthorized activities outlined above. (*Id.*). After confirming that Mr. Moore was indeed on duty on September 23, Mr. Satchell brought the report to the attention of Mr. Moore's managers, transportation coordinator Steve Orr and vice president of operations Rick Bennett. (*Id.*).

8. After reviewing the report, Mr. Satchell, Mr. Orr, and Mr. Bennett met with Mr. Davis, who further elaborated on the events he had observed. (Bennett Aff. ¶ 9). After the meeting, Mr. Davis prepared a supplemental report containing additional information about Mr. Moore's activities during his September 23 shift. (*Id.*). Taken together, the two reports contained evidence of several potential violations by Mr. Moore of Company policy. (*Id.*).

9. Next, Messrs. Orr, Bennett, and Whitaker (the Warehouse Manager) met with Mr. Moore and questioned him about his conduct on September 23, 2002. (Bennett Aff. ¶ 10). Although he denied other wrongdoing, he admitted that he had improperly used his access card to bring his girlfriend through the front gate and onto Company premises. (*Id.*). Both Mr. Orr and Mr. Bennett had previously instructed Mr. Moore several times that non-Company personnel, including his girlfriend, are not permitted on Company property. (*Id.*). Based on the Company's review of the evidence, including Mr. Moore's admitted violation of Company policy, PYA Monarch terminated Mr. Moore. (*Id.*).

10. Mr. Moore subsequently applied for unemployment benefits with the VEC. (Bennett Aff. ¶ 11). The VEC denied his initial application, based on the Deputy's finding that PYA Monarch had terminated Mr. Moore for misconduct. (*Id.*). Mr. Moore appealed this determination, and a trial-type hearing was conducted before an appeals examiner on November 29, 2001. (*Id.*).

11. At the hearing, Mr. Bennett and Mr. Orr testified on behalf of PYA Monarch. (Bennett Aff. ¶ 12). During his testimony, the VEC appeals examiner questioned Mr. Bennett about how the Company knew what Mr. Moore had been doing at work on September 23. (*Id.*). Mr. Bennett explained that Mr. Davis observed Mr. Moore, prepared incident reports, and briefed management. (*Id.*). The appeals examiner directed Mr. Bennett to provide her with copies of the reports. Mr. Bennett complied. (*Id.*).

12. The appeals examiner read the reports, gave Mr. Moore the opportunity to examine them, and entered them into evidence. (Bennett Aff. ¶ 13). Mr. Moore filed this lawsuit on April 30, 2002, claiming that the reports contained defamatory statements, and that PYA Monarch defamed him by submitting the reports to the VEC.

## DISCUSSION

District courts may enter summary judgment only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Miller v. Leathers,* 913 F.2d 1085, 1087 (4th Cir.1990). The facts and inferences drawn from the pleadings must be viewed in the light most favorable to the nonmoving party. *Nguyen v. CNA Corp.,* 44 F.3d 234, 237 (4th Cir.1995). Summary judgment is appropriate when the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In order to successfully defeat a motion for summary judgment, a nonmoving party cannot rely on "mere belief or conjecture, or the allegations and denials contained in the pleadings." *Doyle v. Sentry Insur.,* 877 F.Supp. 1002, 1005 (E.D.Va.1995) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Rather, the nonmoving party must set forth specific facts through affidavits, depositions, interrogatories, or other evidence to show genuine issues for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. When the nonmoving party fails to make a sufficient showing establishing an essential elements of his case and he bears the burden of proof on that issue, "there is 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 254, 106 S.Ct. 2505.

As noted in the preceding section of this Opinion and Order, there is no genuine issue as to those facts listed as 1 to 12,

above. This Court must now determine if these admitted facts prevent the Plaintiff from establishing an essential element of his case.

■■■■ This Court's jurisdiction is based on 28 U.S.C. § 1332, so the essential elements in this defamation matter are derived from Virginia state law. "Under Virginia law, the necessary elements of the tort of defamation are (1) publication about the plaintiff, (2) an actionable statement, and (3) the requisite intent." *Chapin v. Greve,* 787 F.Supp. 557, 562 (E.D.Va.1992), *aff'd sub. nom. Chapin v. Knight–Ridder, Inc.,* 993 F.2d 1087 (4th Cir.1993). To be actionable, a statement must be both false and defamatory. *Chapin,* 993 F.2d at 1092 (quoting Restatement (Second) of Torts § 559).

Defendant argues that Plaintiff's claim should be dismissed for three reasons. First, Defendant argues that the Virginia Code bars Plaintiff from using the two security reports PYA Monarch provided to the VEC. Second, Defendant argues Plaintiff's claim is barred because the reports were submitted in the course of a judicial or quasi-judicial proceeding and are therefore protected by absolute privilege. Third, Defendant argues that by applying for unemployment benefits, Plaintiff consented to Defendant's publication to the VEC of information related to the termination of his employment. Alternatively, Defendant argues that their submission of the reports to the VEC is protected by qualified privilege. Because the Court finds the first argument to be dispositive of the case, it need not address the remaining arguments.

**I. Pursuant to Virginia Code § 60.2–623, Plaintiff is barred from using the two reports submitted to the VEC in this or any other judicial or administrative proceeding.**

Virginia Code § 60.2–623 provides in part:

Information furnished the Commission under the provision of this chapter shall not be published or be open to public inspection, other than to public employees in the performance of their public duties. Neither such information, nor any determination or decision rendered under the provisions of §§ 60.2–619, 60.2–620 or § 60.2–622, shall be used in any judicial or administrative proceeding other than one arising out of the provisions of this title . . .

Va.Code § 60.2–623(B) (1950).

■■■■ Courts have interpreted this statute to prohibit the use of information provided to the VEC in judicial proceedings that do not arise under Title 60.2. In *Starks v. McCabe,* 49 Va. Cir. 554, 555 (1998), the plaintiff filed suit for defamation based, inter alia, on information provided to the VEC about the reasons for her discharge. Relying on Va.Code § 60.2–623(B), the court sustained the defendants' demurrer as to information provided to the VEC. *Id.* The court held that because the defamation action did not arise out of Title 60.2 of the Code, "the statute's unqualified prohibition of the use of such information" barred its consideration by the court. *Id.* The court in *Gordon v. Newspaper Ass'n of Am.,* 51 Va. Cir. 183, 187–88, 2000 WL 14693 (2000) rejected plaintiff's argument that the defendant waived the attorney-client privilege by disclosing information about plaintiff's discharge in a letter written to the VEC and in testimony at the VEC hearing. Finding the proceeding did not arise out of Title 60.2, the court held that Va.Code § 62.3–623 "unambiguously precludes the use of the letter written to the VEC and the admission of [the defendant's] testimony in this proceeding for the purpose of considering a waiver of the attorney-client privi-

lege." *Id.* at 188, 2000 WL 14693. Holding Va.Code § 60.2–623 precluded the use of information provided to the VEC in any judicial or administrative proceeding, the Fourth Circuit affirmed the district court's refusal to consider the Employer's Report of Separation and Wage Information from the VEC, even though the form would have supported plaintiff's theory of his termination. *Konjevich v. Washing Systems, Inc.,* No. 93–1763, 1994 U.S.App. LEXIS 6965, 1994 WL 118114 (4th Cir. April 4, 1994) (unpublished opinion).[2]

Here, Plaintiff claims that the Defendant defamed him by submitting two written reports to the VEC related to the reasons for his termination. The reports were provided to the VEC at the direction of the appeals examiner. There is no evidence that the reports were ever published to anyone other than the Defendant and the VEC. The Court **FINDS** that because this proceeding does not arise under Title 60.2, Va.Code § 60.2–623 prohibits Plaintiff from using the two reports submitted to the VEC to support his claim for defamation. Without the use of the VEC reports, relied on exclusively by Plaintiff in this case, Plaintiff fails to establish the necessary elements of the tort of defamation, namely publication of an actionable statement. Accordingly, Defendant's motion for summary judgment is **GRANTED** and Plaintiff's defamation claim is **DISMISSED WITH PREJUDICE.**

The Clerk is **REQUESTED** to mail a copy of this Order to all counsel of record.

It is so **ORDERED.**

---

**2.** Because *Konjevich* is an unpublished opinion it is not binding precedent. This Court, however, finds the explication of Virginia law and the rationale in *Konjevich* persuasive given the facts of the instant case.